UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRENCE DAVIS, | No. C-06-6108 EMC |
| Plaintiff, | **RELATED TO** |
| v. | No. C-09-0980 EMC |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | |
| Defendant. | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| _____/ | |
| JOHN DOE, | **(Docket No. 195 in C-06-6108; Docket No. 109 in C-09-0980)** |
| Plaintiff, | |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | |
| Defendant. | |
| _____/ | |

Plaintiffs have sued the Commissioner of the Social Security Administration ("SSA"), asserting claims for violation of the Rehabilitation Act. According to Plaintiffs, SSA has violated the Rehabilitation Act by failing to make the work reviews under Title II and Title XVI accessible to individuals with mental or developmental disabilities. *See* Docket No. 162 (Pls.' Mot. for Summ. Judg. ("MSJ") at 2)[1]. Currently pending before the Court is the SSA's motion for summary

---

[1] All docket numbers are for the *Davis* case unless otherwise noted.

1  judgment. In the motion, SSA argues that Plaintiffs lack standing to assert their claims. SSA further
2  argues that, based on the deposition testimony of Plaintiffs, the Court lacks jurisdiction over their
3  cases. Having considered the parties' briefs and accompanying submissions, as well as the oral
4  argument of counsel, the Court hereby **DENIES** SSA's motion.

## I. FACTUAL & PROCEDURAL BACKGROUND

6  This case has a complicated procedural background. Mr. Davis's case was initiated in
7  September 2006, and Mr. Doe's case in March 2009. In each case, SSA filed a Rule 12(b) motion to
8  dismiss based on, *inter alia*, a claimed lack of standing and subject matter jurisdiction. In each case,
9  Judge Patel rejected SSA's standing and jurisdiction arguments. Judge Patel found standing based
10 on the emotional distress suffered by Plaintiffs. *See* Davis Docket No. 26 (Order at 11); Doe Docket
11 No. 26 (Order at 17). With respect to jurisdiction, she determined that the Rehabilitation Act claims
12 were sufficiently distinct from the underlying benefits claims that exhaustion of the benefits claims
13 would not assist in resolution of the Rehabilitation Act claims. *See* Davis Docket No. 26 (Order at
14 11); Doe Docket No. 26 (Order at 11). As Judge Patel explained in the Doe case, even if SSA ruled
15 in Mr. Doe's favor on his claim for benefits, he still would have a valid cause of action under the
16 Rehabilitation Act. *See* Doe Docket No. 26 (Order at 11).

17 Notably, Mr. Davis's case (but not Mr. Doe's) was initially filed as a class action. Well
18 before Mr. Doe filed his suit, Mr. Davis moved for class certification. *See* Docket No. 55 (motion).
19 Judge Patel denied the motion but gave Mr. Davis leave to re-file it if, he could, within a certain
20 time period

> 1) set forth sufficient admissible evidence to satisfy the numerosity requirement; 2) associate an experienced federal class-action attorney; and 3) either bring forth representative plaintiffs from other parts of the country who have suffered similar harm resulting from their respective SSA office policies or bring forth admissible evidence that the policies applied by the San Francisco office are applied by all SSA district offices nationwide.

25 Docket No. 74 (Order at 24). Mr. Davis never re-filed and instead filed an amended complaint
26 which no longer included class allegations. *See* Docket No. 86 (fourth amended complaint).
27 Several months after Mr. Davis filed his amended complaint, Mr. Doe initiated his lawsuit, which,
28 as noted above, also contained no class allegations.

In August 2010, Plaintiffs filed an early motion for summary judgment pursuant to Judge Patel's directive that they do so. *See* Docket No. 146 (Tr. at 28); Docket No. 170 (Pyle Decl., Ex. 1) (Tr. at 6). Apparently, Judge Patel wanted Plaintiffs to file a summary judgment motion so that Plaintiffs would have to clearly state what relief they wanted from the Court. Judge Patel had concerns that Plaintiffs would be asking for "expansive" relief that went "way beyond" Plaintiffs themselves. Docket No. 170 (Pyle Decl., Ex. 1) (Tr. at 6).

Based on Plaintiffs' motion for summary judgment, it appears that Plaintiffs' Rehabilitation Act claim concerns the SSA's alleged failure to make the work reviews under Title II and Title XVI accessible to individuals with mental or developmental disabilities. The parties do not dispute that work reviews are reviews that take place *after* an individual has been deemed disabled and granted benefits under Title II and/or Title XVI. *See* Docket No. 162 (Pls.' MSJ at 5); Docket No. 169 (Def.'s Opp'n at 5, 7). Essentially, work reviews are conducted by SSA to ensure that beneficiaries are not earning above a certain income level; if they are, then benefits may be terminated, suspended, and/or reduced. *See* Docket No. 162 (Pls.' MSJ at 6, 8); Docket No. 169 (Def.'s Opp'n at 5, 7).

Under both Title II and Title XVI, there are "work incentives." Essentially, work incentives are "[s]pecial rules [that] make it possible for people with disabilities receiving Social Security or Supplemental Security Income (SSI) to work and still receive monthly payments and Medicare or Medicaid." http://www.ssa.gov/disabilityresearch/wi/generalinfo.htm (last visited on 2/13/2012). One example of a work incentive is an impairment-related work expense ("IRWE"). An IRWE is an expense that a beneficiary incurs that is essential for his or her work. Such expenses are not "counted" in a work review as a part of the beneficiary's earnings. *See* 40 C.F.R. § 404.1576(a) ("When we figure your earnings in deciding if you have done substantial gainful activity, we will subtract the reasonable costs to you of certain items and services which, because of your impairment(s), you need and use to enable you to work."); 40 C.F.R. § 416.976(a) ("When we figure your earnings in deciding if you have done substantial gainful activity, and in determining your countable earned income (see § 416.1112(c)(5)), we will subtract the reasonable costs to you of certain items and services which, because of your impairment(s), you need and use to enable you to

1  work."). Thus, in a work review, if a beneficiary has a work incentive such as an IRWE, he or she
2  may have earnings that do *not* exceed the income level set by SSA and continue to obtain disability
3  insurance benefits under Title II or SSI under Title XVI.
4  According to Plaintiffs, SSA has failed to make the work reviews under Title II and Title
5  XVI accessible to individuals with mental or developmental disabilities because, *e.g.*, SSA has failed
6  to train its employees (claims representatives) on how to conduct work reviews when the persons
7  being reviewed have mental or developmental disabilities (*e.g.*, what work incentives may be
8  applicable), SSA has failed to train its employees on how to communicate with persons with such
9  disabilities, and SSA has failed to modify its forms to make them understandable to persons with
10 such disabilities. *See* Docket No. 162 (Pls.' MSJ at 2, 21-24).
11 In their motion for summary judgment, Plaintiffs argue that, to comply with the
12 Rehabilitation Act, SSA must make the following modifications:
13 (1) Evaluate, monitor, and track individuals with mental or developmental disabilities so that
14    SSA employees are aware of (a) the individuals' disabilities, (b) the associated functional
15    limitations, and (c) the need for reasonable accommodations. Plaintiffs propose that, when a
16    claimant first applies for Title II and/or Title XVI benefits, SSA should evaluate the
17    individual's ability to understand written and oral communications, etc. SSA should then
18    monitor the individual by checking in periodically with his or her treating physicians to see if
19    there are any changes. Finally, the information initially obtained and thereafter updated
20    through monitoring should be tracked and made available to employees.
21 (2) Train SSA employees so that they have knowledge about (a) mental or developmental
22    disabilities and associated functional limitations, (b) how to communicate with persons with
23    such disabilities, and (c) the Rehabilitation Act and reasonable accommodations. Plaintiffs
24    suggest training in particular with respect to work reviews – *e.g.*, what work incentives are
25    generally applicable to persons with mental or developmental disabilities.
26 (3) Modify forms (*e.g.*, pamphlets, notices, work activity reports, both in terms of format and
27    language) to make them easily understandable by persons with mental or developmental
28    disabilities.

4

(4) Utilize existing information within SSA so that beneficiaries with mental or developmental disabilities do not have to inform SSA about what it already knows and so that employees proactively develop possible work incentives.

*See* Docket No. 162 (Pls.' MSJ at 2, 22-23).

Judge Patel held a hearing on Plaintiffs' motion for summary judgment in November 2010. *See* Docket No. 185 (civil minutes); *see also* Docket No. 192 (hearing transcript). In accordance with comments made by Judge Patel at that hearing, the parties stipulated to a schedule under which Judge Patel would hear first *SSA's* motion for summary judgment, which would address threshold issues such as standing and jurisdiction. Only after a ruling on that motion would the parties turn back to Plaintiffs' motion for summary judgment, and Plaintiffs' motion would be considered only after additional discovery and briefing. *See* Docket No. 192 (stipulation and order).

SSA filed its motion for summary judgment – the currently pending motion – in March 2011. *See* Docket No. 195 (motion). Shortly after filing that motion, SSA filed another motion, more specifically, a motion to dismiss or stay proceedings because it had decided to initiate a self-evaluation of its current policies and practices to measure compliance with the Rehabilitation Act. SSA's position was, in essence, that, under exhaustion principles, the cases should be dismissed or stayed because there is a substantial likelihood that the self-evaluation will address the specific concerns raised by Plaintiffs here. *See* Docket No. 211 (motion).

SSA's motion to dismiss or stay was ultimately heard by this Court, after the cases were reassigned. The Court denied the motion to dismiss but granted the alternative motion for a stay. The Court permitted, however, only a limited stay; furthermore, in spite of the stay, it ordered SSA to produce documents to Plaintiffs so that they could determine whether the self-evaluation would in fact address their concerns. *See* Docket No. 243 (Order at 8-9).

In December 2011, the Court held a case management conference to get, *inter alia*, an update on the self-evaluation. In a case management conference statement, Plaintiffs stated that they opposed a further stay. *See* Docket No. 250 (St. at 2). They also submitted declarations in support of their position. Those declarations further addressed, *inter alia*, reasonable accommodations that could be made for Plaintiffs.

5

For example, Mr. Davis states in a declaration:

> I believe that reasonable accommodations in the form of a SSA employee(s) trained to assist me by knowing my impairments and functional limitations, including that I am subject to anxiety as a result of communicating with SSA, would allow me to participate in the various Social Security notices (or other communications) regarding my benefits. If this reasonable accommodation had been in place earlier, I believe they [sic] would have lowered the anxiety level that I had, which resulted in sleepless nights and has required medical intervention in the past.

Docket No. 251 (Davis Decl. ¶ 4).

Similarly, Ariane Eroy, Mr. Doe's primary treating psychologist, states in a declaration:

> I have thought about and discussed various communication accommodations for John Doe with [his attorney]. I believe that reasonable accommodations would be effective in helping him to interact constructively with SSA and would increase his ability to live independently and that these reasonable accommodations would include: 1) John being assigned to a Social Security employee who has been trained about developmental delays, schizophrenia and autism; 2) that John could meet with this worker on an on-needed basis, should he have questions about his benefits and his responsibilities; and 3) that this worker would follow-up such meetings with a memo to the client and his case manager.

Docket No. 252 (Eroy Decl. ¶ 6).

Ultimately, the Court concluded, at the case management conference, that, in spite of the stay, it would proceed with SSA's motion for summary judgment because it dealt with threshold issues of standing and jurisdiction. *See* Docket No. 253 (civil minutes); Docket No. 267 (order). The parties thus completed the briefing on SSA's motion. In its motion, SSA makes arguments similar to those it previously made in its 12(b) motions. For example, SSA argues that Plaintiffs do not have standing to proceed with their cases and that, because these cases are really about benefits rather than systemic changes in SSA policies and practices (as reflected by Plaintiffs' deposition testimony), the Court does not have subject matter jurisdiction until after Plaintiffs have exhausted their administrative remedies. SSA further contends that, these problems aside, Plaintiffs do not have standing to pursue the systemic relief identified in, *e.g.*, their motion for summary judgment.

SSA's motion for summary judgment is the motion currently pending before the Court.

///

///

## II. DISCUSSION

A.  Plaintiffs' Request to File Under Seal (Docket No. 255)

As a preliminary matter, the Court should note that Plaintiffs have asked to file certain documents in support of their opposition brief under seal. *See* Docket No. 255 (Bruce Decl.) (describing documents). Most of the request is appropriate – *e.g.*, where Plaintiffs ask for permission to redact their Social Security numbers from documents and the actual name of Mr. Doe. There is, however, one overbroad request to file under seal. More specifically, Plaintiffs ask that the transcripts for their depositions be sealed in their entirety. While there are significant portions of the depositions which discuss confidential or personal information, there are also significant portions that do not. It may be time consuming for Plaintiffs to go through a redaction process, but the public also has an interest in seeing as much as the file as it can given the issues being litigated in the case. Civil Local Rule 79-5 also indicates that any sealing be narrowly tailored. *See* Civ. L.R. 79-5(a) (providing that "[t]he request must be narrowly tailored to seek sealing only of sealable material").

Accordingly, the Court grants Plaintiffs' request to file under seal but, with respect to the deposition transcripts, orders Plaintiffs to publicly file transcripts which have confidential or personal information redacted. Counsel for Plaintiffs is directed to electronically file the documents under seal pursuant to General Order 62 by February 21, 2012. On that same date, Plaintiffs shall make their public filing.

B.  Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in

7

United States District Court
For the Northern District of California

the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Here, although evidence is to be viewed and inferences are to be drawn in Plaintiffs' favor (as the nonmoving parties), Plaintiffs still have the burden of proving standing and subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating that "[t]he party invoking federal jurisdiction bears the burden of establishing [the] elements [of constitutional standing]"); *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1137 (10th Cir. 2006) (noting that "[t]he burden to establish prudential standing is on the plaintiff bringing the action"); *Mathews v. Eldridge*, 424 U.S. 319, 327 (1976) (stating that "42 U.S.C. § 405(g) . . . requires exhaustion of the administrative remedies provided under the [Social Security] Act as a jurisdictional prerequisite"); *Ureno v. Astrue*, No. 1:10cv2163 SKO, 2011 U.S. Dist. LEXIS 52826, at *9 (E.D. Cal. May 17, 2011) (rejecting plaintiff's contention "that Defendant has the burden to prove the defense of failure to exhaust administrative remedies, [because] it is in fact the plaintiff's burden to establish that subject matter jurisdiction is proper"). Because Plaintiffs have the ultimate burden of proof on both standing and jurisdiction, SSA may prevail on its motion for summary judgment simply by pointing to Plaintiffs' failure "to make a showing sufficient to establish the existence of an element essential to [their] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

C.  <u>Standing</u>

SSA argues first that, as a matter of law, Plaintiffs lack both constitutional standing and prudential standing to proceed with their cases.

1.  <u>Constitutional Standing</u>

> To establish Article III [*i.e.*, constitutional] standing, a plaintiff must show: (1) "an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

8

1  *Drake v. Obama*, Nos. 09-56827, 10-55084, 2011 U.S. App. LEXIS 25763, at *6 (9th Cir. Dec. 22,
2  2011) (quoting *Lujan*, 504 U.S. at 560-61). Where a plaintiff seeks injunctive relief, he or she must
3  show not only an injury in fact but also "'a sufficient likelihood that he will again be wronged in a
4  similar way.' That is, he must establish a 'real and immediate threat of repeated injury.'" *Chapman*
5  *v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 948 (9th Cir. 2011). According to SSA, Plaintiffs have, as
6  a matter of law, failed to establish any of the above elements – *i.e.*, an injury in fact, likelihood of
7  future injury, traceability, or redressability. The Court does not agree.

8  On the first element, *i.e.*, injury in fact, the Court acknowledges that Judge Patel's prior
9  orders focused on Plaintiffs' emotional distress. *See* Davis Docket No. 26 (Order at 11) (citing *Situ*
10 *v. Leavitt*, No. C06-2841 TEH, 2006 WL 3734373, at *4 (N.D. Cal. Dec. 18, 2006); Doe Docket No.
11 26 (Order at 17) (citing the same). Contrary to what SSA suggests, many courts have found that
12 emotional distress may constitute an injury-in-fact for purposes of standing. *See, e.g.*, *Soobzokov v.*
13 *Holder*, No. 10-6260 (DRD), 2011 U.S. Dist. LEXIS 65007, at *11-12 (D.N.J. June 7, 2011)
14 (holding that plaintiff "has satisfied the elements of standing" because "[h]e alleges to have
15 personally suffered emotionally as a result of Defendants' failure to vigorously investigate and
16 prosecute several suspects for the murder of his father, and his request for damages and an
17 independent inquiry into Defendants' investigation will likely redress his suffering"); *Kennedy v.*
18 *City of Zanesville*, 505 F. Supp. 2d 456 , 484 (S.D. Ohio 2007) (stating that "Plaintiffs have each
19 alleged an actual, particularized injury in fact" by "claim[ing] that the pattern and practice of
20 discrimination by Defendants have resulted in economic loss, lack of fire suppression, humiliation,
21 embarrassment, and emotional distress over having poor water"); *Carlough v. Amchem Prods.*, 834
22 F. Supp. 1437, 1451 (E.D. Pa. 1993) (noting that "other kinds of non-economic harm have been
23 accepted as Article III injury in fact, including aesthetic harm and emotional distress").

24 Moreover, SSA fails to take into account that Plaintiffs' emotional distress arises from their
25 claimed inability to meaningfully participate in the work review process. Thus, ultimately,
26 Plaintiffs' primary injury in fact is the alleged discrimination suffered. Such discrimination clearly
27
28

9

can be an injury in fact for purposes of standing.[2] *See, e.g.*, *Chapman*, 631 F.3d at 947 (stating that "'[o]nce a disabled individual has encountered or become aware of alleged ADA violations that deter his patronage of or otherwise interfere with his access to a place of public accommodation, he has already suffered an injury in fact traceable to the defendant's conduct and capable of being redressed by the courts, and so he possesses standing under Article III'"); *Armstrong v. Davis*, 275 F.3d 849, 864 (9th Cir. 2001) (stating that "plaintiffs are subjected to discriminatory treatment on account of their disabilities in violation of both the ADA and the Rehabilitation Act" and that "[t]his treatment is sufficient to constitute an actual injury"); *cf. Tennessee v. Lane*, 541 U.S. 509, 513-14 (2004) (plaintiff asserting a Rehabilitation Act claim because county courthouse had no elevator and therefore plaintiff had to crawl up two flights of stairs to get to the courtroom to answer a set of criminal charges).

---

[2] To the extent SSA contends that Plaintiffs no longer suffer emotional distress, the evidence of record does not fully support that contention.

For example, SSA asserts that Mr. Davis no longer suffers emotional distress because he has SSA notices go to his attorney now instead of himself directly. *See* Mot. at 15 (arguing that this process has "moot[ed] any possible complaints about the stress of receiving notices generally"). But there is nothing to indicate that this is a permanent arrangement. In fact, it appears that the parties negotiated this arrangement as a part of this litigation only, in order to resolve Mr. Davis's motion for temporary or preliminary injunctive relief. *See* Docket No. 51 (stipulation and order).

As for Mr. Doe, SSA suggests that he does not suffer emotional distress because he has not sought additional psychological treatment, he has admitted that his condition has improved, and he has help in understanding SSA notices (from his attorney, his mother, and his living skills trainer). SSA further asserts that, to the extent Mr. Doe has emotional distress, he has attributed that distress to this litigation and not to other conduct by SSA. None of these arguments is particularly persuasive. Contrary to what SSA argues, Mr. Does does appear to have sought psychological treatment because of SSA's actions. Mr. Doe's treating psychotherapist has submitted a declaration in which she states that Mr. Doe has in fact expressed to her "his fears at being unable to participate adequately in [SSA's] processes, including his ability to comprehend SSA's written notices and his difficulties in communicating orally with SSA staf[f]." Eroy Decl. ¶ 4. As for the fact that Mr. Doe's condition may have improved, that does not mean that he does not suffer any emotional distress all. *See* Opp'n, Ex. I (Doe Depo., Ex. 110) (checking box on "*[r]educed* feelings of nervousness") (emphasis added). Finally, the fact that Mr. Doe is able to obtain assistance in understanding SSA notices does not mean that he still does not suffer emotional distress as a result of the notices. To the extent SSA argues that Mr. Doe has attributed his distress to this litigation and not to SSA directly, that is not a fair characterization of Mr. Doe's deposition testimony. At the deposition, Mr. Doe was asked what SSA was doing "currently" to make him think about suicide. His response was: "I guess it's mainly because you're asking me all these questions." Opp'n, Ex. I (Doe Depo. at 125).

To the extent SSA contends there is no injury in fact unless Plaintiffs suffer a denial of benefits, that argument is meritless. If Plaintiffs are subject to discrimination in the process and denied equal access as required under the Rehabilitation Act, they have standing to assert a Rehabilitation Act claim. The fact that the plaintiff in *Tennessee v. Lane* ultimately made it to the courtroom by crawling up the courthouse steps did not negate his claim of unequal access.

Of course, to establish standing for injunctive relief, there must be not only an injury in fact but also "'a sufficient likelihood that [the plaintiff] will again be wronged in a similar way.'" *Chapman*, 631 F.3d at 948. In *Chapman*, the Ninth Circuit expressly stated that

> [a]n ADA plaintiff can show a likelihood of future injury when he intends to return to a noncompliant accommodation and is therefore likely to reencounter a discriminatory architectural barrier. Alternatively, a plaintiff can demonstrate sufficient injury to pursue injunctive relief when discriminatory architectural barriers deter him from returning to a noncompliant accommodation.

*Id.* at 950. In light of *Chapman*, SSA's position that Plaintiffs lack standing to pursue injunctive relief is hard to comprehend. There is no dispute that Plaintiffs have both been determined to be disabled under the Social Security Act. Furthermore, there is no dispute that they will continue to be subject to work reviews in order to continue getting benefits under Title II and/or Title XVI. To the extent SSA's argument here is simply that "Plaintiffs cannot show that they will continue to have problems" because SSA has "appoint[ed] employees to assist [them] while the cases are stayed," Reply at 13, the Court is not persuaded. The fact that SSA has offered what is in essence some temporary or preliminary injunctive relief does not moot out the permanent relief sought by Plaintiffs.

Finally, SSA's arguments on traceability and redressability fail to take into account that Plaintiffs' injury in fact is ultimately the alleged discrimination. To the extent SSA's arguments are focused on Plaintiffs' claims really being claims for benefits, those arguments are addressed in the section below on subject matter jurisdiction. *See* Part II.D, *infra*.

The Court therefore denies SSA's motion for summary judgment based on a lack of constitutional standing.

11

2. Prudential Standing

In its motion for summary judgment, SSA argues not only constitutional standing but also prudential standing.

> "[P]rudential standing concerns require that [a court] consider . . . whether the alleged injury is more than a mere generalized grievance, whether [plaintiffs] are asserting [their] own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the constitutional guarantee in question."

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009). Here, Plaintiffs have alleged personal violations of the Rehabilitation Act for which they seek redress. To the extent SSA has concerns about the breadth of Plaintiffs' claims, *see* Mot. at 19 (arguing that broad allegations seeking systemic relief are being made), that is more appropriately addressed in the section below on whether Plaintiffs have standing to seek systemic relief (*i.e.*, the scope of Plaintiffs' standing). *See* Part II.E, *infra*; *cf. Chapman*, 631 F.3d at 950 (stating that, "[o]nce a plaintiff establishes Article III standing, there remains the question of the scope of his standing"). To the extent SSA relies on *Allen v. Wright*, 468 U.S. 737 (1984), the argument is not on point because *Allen* did not focus on prudential standing but rather on constitutional standing, more specifically, the traceability requirement. *See id.* at 759-60 ("The idea of separation of powers that underlies standing doctrine explains why our cases preclude the conclusion that respondents' alleged injury 'fairly can be traced to the challenged action' of the IRS.").

Accordingly, there is no basis for granting SSA summary judgment based on prudential standing principles.

D. Subject Matter Jurisdiction

SSA argues next that, even if Plaintiffs have standing to proceed with their cases, the Court still lacks subject matter jurisdiction over the cases. SSA acknowledges that, previously, Judge Patel determined that there was subject matter jurisdiction and thus denied its 12(b) motions to dismiss. SSA maintains, however, that Judge Patel predicated her decision on Plaintiffs' Rehabilitation Act claims being sufficiently distinct from the underlying benefits claims such that exhaustion of the benefits claims would not assist in resolution of the Rehabilitation Act claims. *See* Davis Docket No. 26 (Order at 11); Doe Docket No. 26 (Order at 11). According to SSA, now that

Plaintiffs have been deposed, it is clear that Plaintiffs' claims are really benefits claims – *i.e.*, during their depositions, Plaintiffs made clear they are concerned about maintaining their benefits.

In their opposition brief, Plaintiffs suggest that their deposition testimony cannot be completely taken at face value and interpreted as eschewing relief directed at systemic problems because they have mental and/or developmental disabilities. That is a fair observation. Notably, SSA did not, during Plaintiffs' depositions, ask whether their mental or developmental disabilities would affect their ability to be deposed. And Plaintiffs' responses during the depositions suggest that their disabilities do in fact affect their ability to be deposed.[3] In addition, there is medical evidence that indicates Plaintiffs' ability to be deposed is affected by their disabilities.[4] The medical evidence submitted by Plaintiffs also supports Plaintiffs' position that their declarations submitted in

---

[3] For example, as noted above, Mr. Doe stated that he was thinking about committing suicide because SSA's attorney was asking him questions. *See* Opp'n, Ex. I (Doe Depo. at 125); *see also* Opp'n, Ex. I (Doe Depo. at 115) (stating to SSA's attorney after being asked multiple questions about auditory hallucinations, "[Y]ou're driving me crazy"). In his deposition, Mr. Davis engaged in an exchange with SSA's attorney about whether SSA did anything that caused him to hallucinate. *See* Opp'n, Ex. F (Davis Depo. at 85) (stating, "Asking me what I do with every penny and dime that I get from Social Security, asking me, um – asking – just – just ask me simple questions. . . . If – if you think those – if you call those hallucinations, of course, then I say Social Security is giving me hallucinations").

[4] For example, there is a 1987 psychiatric evaluation of Mr. Davis (Exhibit F attached to Plaintiffs' motion for summary judgment), in which the doctor notes, *inter alia*, that Mr. Davis tends to present in a more positive light than he actually feels, that he is quite inflexible in terms of communication, that his stream of thought is marked by constricted affect and thinking range, that there is evidence he has poor judgment and unrealistic self assessment, that he has a tendency to retreat from significant interaction with others, that he likely responds to environmental challenges with inappropriate thinking and behavior, and that he has a vulnerable pattern of ego functions that are overwhelmed under increasing amounts of stress. Although this evaluation is more than 20 years old, there is also a more recent evaluation of Mr. Davis (Exhibit K attached to Plaintiffs' motion for summary judgment), in which the doctor states that Mr. Davis generally does not perceive him in a realistic manner with respect to work accomplishments or lack thereof and that he is likely to be overprotective about stating he is unable to work based on a disability.

As for Mr. Doe, there is a declaration from his treating pscyhotherapist in which she opines that "a deposition is not an appropriate means of obtaining reliable information from Mr. Doe" because, "[a]s a result of his impairments, he fails to understand symbolic or abstract thought"; because, "[u]nder stress, it is common for Mr. Doe to become overly stimulated, to misread cues, or even to lash out in anger"; and because, "[d]uring the deposition, Mr. Doe may have failed to stop the proceedings to ask for clarification, even if confused." Eroy Decl. ¶ 3. The doctor continues: "It is not unusual for Mr. Doe to experience problems in: 1) maintaining his level of attention; 2) processing information; and 3) transitioning between subjects." Eroy Decl. ¶ 3.

support of the opposition to the summary judgment motion (in which they testify they had difficulties in the deposition[5]) are not sham declarations.

In its reply brief, SSA argues that Plaintiffs should not be allowed to pick and choose what is reliable in their depositions and/or declarations and what is not. *See* Reply at 1 ("Plaintiffs oppose SSA's motion by claiming that anything harmful in Plaintiffs' testimony is unreliable, while simultaneously relying on the same deposition testimony for statements Plaintiffs perceive as helpful and submitting declarations from these purportedly unreliable individuals."). While SSA's point is understandable, it is not persuasive. At this juncture, all evidence is to be viewed and all inferences are to be drawn in Plaintiffs' favor as they are the nonmoving parties. This includes "'questions of credibility and of the weight to be accorded particular evidence.'" *Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 1132-33 (9th Cir. 2003); *see also* Fed. R. Evid. 601 & advisory committee notes (providing that "[e]very person is competent to be a witness" because "[a] witness wholly without capacity is difficult to imagine," but how much weight and credibility to give to the witness is a matter for the jury to decide).

Finally, the fact that Plaintiffs did not disavow caring about their benefits does not mean that they do not also care about being able to participate in the SSA work review process. This is because maintaining benefits is intimately tied to participation in the SSA work review process; *i.e.*, without being able to fully participate in the process (*e.g.*, understand the SSA notices), Plaintiffs' benefits are potentially jeopardized. Furthermore, in their depositions, Plaintiffs did make comments indicating that they do in fact care about participation. *See, e.g.*, Opp'n, Ex. F (Davis

---

[5] *See, e.g.*, Davis Decl. ¶ 8 ("During my deposition, I had a lot of difficulties. I generally need a lot of time to understand SSA notices. During the deposition, I was not given the time I needed to absorb and understand the documents I was given. I would have been able to give better answers if I had had more time. There were many times that I did not understand the question I was being asked. At other times, it was hard for me to answer because I felt like I was being accused of lying."); Doe Decl. ¶ 7 ("During my deposition, I had a lot of difficulty understanding the questions that I was asked and how to answer them. Many times Mr. Pyle used unusual and complicated words in his questions. I did the best I could. It would have been easier for me if I had been allowed to take more time to answer the questions but I felt like I had to answer the questions right away. Also I had a hard time because it was not like a conversation. The questions were not on the same subject. Sometimes when I tried to ask a question, Mr. Pyle cut me off. Sometimes I would be shown a document and asked a question about something else. I get distracted when he changes the subject. When I get distracted, I forget what I am going to say.").

Depo. at 75) (stating that, when he fills out a form, he is not sure whether he has filled it out correctly; "I hesitate to turn them in to Social Security because I think I might have made a mistake or errors"); Opp'n, Ex. H (Doe Depo. 95) (testifying that he wanted professional help – *i.e.*, help from his attorney and his independent living skills trainer – to deal with Social Security and help understand documents).

Accordingly, the Court rejects SSA's argument that the evidence of record establishes that Plaintiffs care only about their benefits (in which case there must first be administrative exhaustion) and not about participation (protected by the Rehabilitation Act). Plaintiffs have not waived or abandoned their Rehabilitation Act claims.

E. <u>Standing re Systemic Relief</u>

The final issue for the Court is whether, Plaintiffs have "standing" to pursue systemic relief as opposed to individual relief. (Although SSA refers to "standing," it probably is better to frame the issue as to whether the *scope* of the injunctive relief sought by Plaintiffs is proper.) SSA also argues, for the first time in their reply brief, that to the extent Plaintiffs seek individual relief, that relief has not been adequately pled in the complaints and is in any event not ripe.

With respect to systemic relief, it is important to note – as SSA emphasizes – that neither the *Davis* nor the *Doe* case is, at present, a class action. Indeed, the *Davis* case was initially filed as a class action, but Judge Patel denied Mr. Davis's motion for class certification and, although given an opportunity to re-file such a motion, he declined to do so. "[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996); *see also Zepeda v. United States Immigration & Naturalization Serv.*, 753 F.2d 719, 729 n.1 (9th Cir. 1985) (vacating preliminary injunction because it gave "broad relief . . . not necessary to remedy the rights of the individual plaintiffs; if the scope of the injunction is narrowed, there is no question that the individual plaintiffs will be protected from the INS's former practices" and "[t]hat is all the relief to which they are entitled"; adding that "there would be no need for class actions" if the opposite were true).

Still, that does not necessarily mean that Plaintiffs are barred from seeking and obtaining systemic relief. First, "an injunction is not necessarily made overbroad by extending benefit or

1 protection to persons other than prevailing parties in the lawsuit – even if it is not a class action – if
2 such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at
3 1501-02 (emphasis omitted). For example, in *Easyriders*, the district court issued an injunction
4 barring the California Highway Patrol ("CHP") from citing from *any* motorcyclists – and not just the
5 individual plaintiffs who had brought suit – without probable cause to believe that they had violated
6 the California Vehicle Code helmet law. *See id.* at 1492-93. The Ninth Circuit upheld the
7 injunction, explaining as follows:

> Because the CHP policy regarding helmets is formulated on a statewide level, other law enforcement agencies follow the CHP's policy, and it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs or a member of Easyriders, the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction.

*Id.* at 1502. In order for the plaintiffs to get effective relief, systemic relief was necessary.

Second, the Ninth Circuit has indicated that, where there is a systemwide injury because of a policy or practice that pervades an institution, then widespread relief is justified to remedy that injury. *See Clement v. California Dep't of Corrections*, 364 F.3d 1148, 1153 (9th Cir. 2004) (emphasizing that the scope of an injunction depends on the extent of the violation established, and citing in support *Armstrong v. Davis*, 275 F.3d 849, 870 & n.27 (9th Cir. 2001)). Thus, in *Clement*, the Ninth Circuit deemed appropriate an injunction enjoining the enforcement of an internet mail policy in all California prisons, and not just the prison where the plaintiff was housed, because there was "uncontroverted evidence that at least eight California prisons ha[d] adopted [the] policy" and more were considering it. *Id.* "Because a substantial number of California prisons are considering or have enacted virtually identical policies, the unconstitutional policy has become sufficiently pervasive to warrant system-wide relief." *Id.* The court also noted:

> The state offers no argument that a total internet mail ban might be constitutional if implemented at a different prison. In such circumstances, it would be inefficient and unnecessary for prisoners in each California state prison to separately challenge the same internet mail policy; it would simply force [the California Department of Corrections] to face repetitive litigation.

*Id.*

While Plaintiffs have not at this juncture sufficiently shown that their cases may be analogous to *Easyriders* (nationwide changes may not be necessary to accommodate Mr. Davis and Mr. Doe), their cases may be comparable to *Clement*. That is, they have submitted evidence indicating that the alleged deficiencies in the handling of work reviews by the SSA is systemwide which, under *Clement*, would give rise to the possibility of broad relief. For example, Plaintiffs have pointed out that at least three other individuals with mental or developmental disabilities have filed complaints with SSA related to the lack of reasonable accommodations. *See* Docket No. 155 (Pls.' MSJ at 9 & Ex. WW). Plaintiffs have also pointed to statistics indicating that, *e.g.*, mentally disabled individuals have their benefits terminated based on work reviews at a disproportionate rate. *See* Docket No. 155 (Pls.' MSJ at 20 & Exs. H, KKK).

At the hearing, SSA did not so much take issue with the above evidence as criticize *Clement*. SSA's criticism is understandable. It is difficult to square *Clement* with other authority holding that "injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Easyriders*, 92 F.3d at 1501. However, *Clement* is still good law in this circuit, and the Court is bound thereby.[6]

Because Plaintiffs have submitted some evidence indicating that there may be a systemwide problem, the Court defers ruling on the issue of whether Plaintiffs have adequately established "standing" to pursue systemic relief. The Court notes that deferral of the issue is especially appropriate because this issue of standing is inextricably intertwined with the merits of this case and, because the Court previously bifurcated discovery, the merits phase of this case is not yet ripe for adjudication. Hence, the Court denies this part of the SSA's motion without prejudice.

Finally, to the extent SSA has now challenged any individual relief requested by Plaintiffs, the Court rejects that challenge. First, SSA never made that argument in its opening motion; it is not fair for SSA to now raise the argument for the first time in its reply brief. Second, contrary to what

---

[6] To the extent SSA indicated at the hearing that the Court should certify for an interlocutory appeal the validity of *Clement*, at least in the context of this case, it is free to make a motion before this Court if the criteria set forth therein are satisfied. *See* 28 U.S.C. § 1292(b).

SSA suggests, Plaintiffs' complaints may be fairly read to include a request for individualized relief even if the complaints do not identify the exact individualized relief sought (*e.g.*, being assigned a trained SSA employee). Third, to the extent SSA argues that the specific accommodations identified by Plaintiffs in their December 2011 declarations (*i.e.*, being assigned a trained SSA employee) are not ripe for review, that argument does not have much merit. As noted above, the accommodations requests are not really new; rather, they are simply more specific. Judge Patel has already held that Plaintiffs have appropriately exhausted their Rehabilitation Act claims. *See* Davis Docket No. 26 (Order at 8) (noting that "Plaintiff's claims in the instant action arise from the civil rights proceeding, for which defendant acknowledges plaintiff has exhausted his administrative remedies"); Doe Docket No. 26 (Order at 15) (finding exhaustion of the civil rights claim because Mr. Doe had filed an administrative action and SSA issued a final position on the same substantive claim raised by other individuals). Moreover, there is nothing to suggest that SSA would give Plaintiffs the specific accommodations sought if it were given the opportunity to consider the request. Notably, in its reply brief, SSA states that it has appointed employees to assist Plaintiffs but only "while the cases are stayed." Reply at 13.

## III. CONCLUSION

For the foregoing reasons, the Court rules as follows.

(1) Plaintiffs' motion to file under seal is granted but Plaintiffs must publicly file a redacted version of the transcripts of Plaintiffs' depositions.

(2) SSA's motion for summary judgment is denied.

(3) In light of the Court's denial of SSA's motion for summary judgment, Plaintiffs' objections to SSA's reply brief and motion to strike certain portions of the reply brief are moot.

Finally, because the Court is denying SSA's motion for summary judgment, the next step for the Court is to consider how to proceed with Plaintiffs' motion for summary judgment. As the Court stated at the hearing and in its order of February 1, 2012, *see* Docket No. 267 (order), the parties' previous stipulation, entered as an order by Judge Patel, indicated that there would be a period for merits discovery and then an opportunity for new briefing based on the merits discovery. Given the passage of time since Plaintiffs' motion was originally filed, the Court was inclined to follow this

approach. Plaintiffs, however, suggest that the Court could entertain the motion at this juncture, based on the discovery already completed and the briefs already submitted, *aside* from the request for systemic relief.

In light of Plaintiffs' proposal, the Court orders the parties to meet and confer to discuss whether this approach is feasible. The Court notes that it may be possible to proceed with Plaintiffs' motion based on the discovery that has already been completed. It appears that Plaintiffs are willing to forego any further discovery[7]; it is not clear what discovery SSA would need to conduct now that Plaintiffs have been deposed. New briefing, however, may be warranted in light of the passage of time.

**The meet and confer shall take place within a week of the date of this order. Within two weeks of the date of this order, the parties shall file a joint statement as to how the Court should proceed on Plaintiffs' motion for summary judgment. If the parties are unable to reach an agreement on how to proceed, then each side should state its last offer of compromise.**

This order disposes of Davis Docket Nos. 195, 255, and 266 and Doe Docket Nos. 109, 167, and 178.

IT IS SO ORDERED.

Dated: February 13, 2012

EDWARD M. CHEN
United States District Judge

---

[7] The Court assumes that, potentially, Plaintiffs would want to take discovery related to systemic relief but, as noted above, Plaintiffs are proposing a summary judgment that would *not* address systemic relief.